May I proceed? Yes. May it please the Court, my name is Stephanie Bond. I was trial counsel for Mr. Alcantar. My co-counsel for appeal purposes is Thomas Wilson. I was planning to talk about ten minutes and reserve about five minutes, and Mr. Wilson will do rebuttal at that point. In our brief, Your Honor, we submitted five different issues. And for today I had planned to focus on two of the issues, specifically the first one being the conspiracy to possess with the intent to distribute cocaine, the second one being the use of the destructive device in furtherance of a drug trafficking offense. It is our position that if the Court agrees with us that those crimes were not proven, then the other issues really become moot in this case. The first one being the district court erring in not granting a judgment of acquittal on the conspiracy to possess with the intent to distribute cocaine. Viewing the evidence in the light most favorable to the prosecution, which in our opinion is viewing the evidence as though the prosecution's witnesses were telling the truth, basically what you have is you have talk. You have talk about cocaine. But that's all you have. And that's all the evidence showed ever actually transpired in this case. It is our position that talk is not enough, that you have to have something else. You have to have actually drugs. You have to have at least a discussion about money. You have to have some type of money exchanging hands. You have to at least have something showing that Raul Figueroa, who supposedly was going to supply the drugs, actually tried to obtain drugs. And we don't have any of those issues. We have testimony that Ryan Polito asked Raul Figueroa for drugs. And then we had testimony that that's all that ever happened. According to Ryan Polito, every time he called Raul Figueroa about obtaining the drugs, Raul Figueroa didn't answer his phone. So you have no overt act on behalf of anybody in the conspiracy. You only have talk. And that is basically what Mr. Alcantar is alleged to have done, is agreed with Ryan Polito and Joshua Mosher that they should try to obtain cocaine. But there's no other action to actually get that done except for a few phone calls in which Mr. Figueroa never answered the phone. We also had differing testimony on how much cocaine they were actually asking for. We had the indictment saying it was 2 kilograms of cocaine. We had Ryan Polito saying it was 5 kilograms of cocaine that he was trying to purchase. Joshua Mosher said it was 2 ounces of cocaine that they were trying to purchase. And Eric Kornig said, nobody told me anything about any kind of drugs. I didn't know drugs were even involved. There was no evidence presented that anybody in this conspiracy ever had dominion or control over the cocaine. And I would agree that the government doesn't have to prove that Mr. Alcantar individually had dominion or control, but somebody had to. They have to prove somebody actually had dominion or control over this, either that being Raul Figueroa. And we had no testimony about that. We had no testimony that Raul Figueroa at any point actually got cocaine or tried to get cocaine. We definitely don't have Ryan Polito or Joshua Mosher ever saying that they had cocaine. And so somebody in this conspiracy has to have dominion and control in the defense's  conspiracy to possess cocaine without there being cocaine. Is that fair? Well, I think somebody at some point in the conspiracy has to have dominion or control over cocaine, yes. What is the authority for that? Your Honor, I don't have my – I'm sure my co-counsel can answer that. If that's okay, on rebuttal, he can look that up, because I don't have that in my notes. I apologize. But that is definitely the defense's position, is that you've got to have something and you just don't have it. The other issue, Your Honors, is the issue of whether or not a destructive device was used in relation to a drug trafficking offense. So if Your Honors believe that there was evidence of a conspiracy to possess cocaine, then obviously we get to the issue of whether or not there was a destructive device used in furtherance of this conspiracy. And the Supreme Court – Your contention is that if the conspiracy charge falls, everything else – everything else falls out of the case. Everything else falls. We get to the destructive device question. Correct. Correct. And, Your Honors, the Supreme Court in the United States v. Resom has said that to use a destructive device or a firearm in – during a drug trafficking offense, there has to be some kind of temporal link. There has to be – it has to be contemporaneous with the commission of the underlying drug crime. And that's exactly what we do not have here. We have this talk going on. An unknown amount of time goes by, but people estimated – witnesses estimated a couple of weeks go by. And then we have this meeting at Lakeside Park where Raul Figueroa shows up and meets with Ryan Polito and Eric Kornig. Doesn't bring cocaine. Says he's not giving him cocaine. Can't get cocaine. We have this conspiracy at this point, according to Mr. Polito, to kill Raul Figueroa. So we have the issue that they go out, they take Mr. Kornig and Mr. Polito take Mr. Figueroa out to this predetermined place in the desert. They're driving there. Then Ryan Polito states in his testimony that he and supposedly Mr. Alcantar, who is supposedly on the phone talking to Ryan Polito at this point, formulate a new plan. They've abandoned the plan of any kind of drug conspiracy. They formulate this new plan that they're going to extort money from Raul Figueroa basically if he wants to live, he's going to pay for his life. Supposedly Mr. Alcantar says he's going to pay $25,000. Ryan Polito says, no, Figueroa, you're going to pay $6,000. So at this point, we don't even have a drug conspiracy anymore if we even had one in the first place. That has been completely abandoned. We have a new thing of where we want money. No discussion about wanting drugs. No discussion about Raul Figueroa giving them money or drugs. It's we want $6,000. Now we have an agreement. We have an amount. So Raul Figueroa says he'll pay it. And we do have a payment. We have a payment a short time later of $200. Then after that, a week or so after that, when Raul Figueroa isn't making any more payments, we have this discussion about using a destructive device to send him a message. The conspiracy, if there ever was one on the cocaine, has been abandoned. They are after money. They're sending him a message that, you know what, you are going to die if you don't give us the money that you said you'd give us. That's the conspiracy at that point. The destructive device is weeks after Lakeside Park. Okay. Where did the district court go wrong here? Because they failed to grant our motion for judgment of acquittal. The evidence did not support it should not have gone to the jury at all because there just wasn't evidence of that. And I see my time is up. I want to make sure Mr. Wilson gets his chance. So thank you. Good morning, Your Honors. May it please the Court. My name is Ryan DiGio. I represent the United States Attorney's Office for the District of Arizona. In speaking about these claims regarding the sufficiency of the evidence, the government does not require to prove, as counsel stated, someone had dominion and control over cocaine to prove the elements of a cocaine conspiracy. And as we cited and as established in the Shabani case, the government also does not have to prove an overt act to sustain a conviction under Title 21, Section 846, for a cocaine conspiracy. The only thing the government had to prove at trial, and of course the district court allowed the case to go to the jury and the jury did find the defendant guilty, is to show the agreement, to show the conspiracy, that they had, the defendant and his co-conspirators, had an agreement to accomplish an object. That object was to procure cocaine to sell to raise money for their gang business, the Mexican Mafia, to provide money. Your response to the argument that there's nothing, there's no cocaine, there's no showing that there was any cocaine anywhere, that they were just, they were just talking about something that may not have had any reality? The argument is that the agreement is there, and that the agreement was shown through the testimony, and that there were, in fact, overt acts, even though it's not required proof for 846. The testimony showed that one of the co-conspirators, this Ryan Polito, had initial conversations with Raul Figueroa, where Figueroa stated, I can get you kilograms of cocaine. So there was an initial agreement. Figueroa was later reticent to provide the cocaine, but the agreement was there because Polito, as he testified, was an underling to the defendant and the structure of this gang, the New Mexican Mafia, and that he went to the defendant, his superior, and received permission to go ahead and set up this cocaine deal. When Figueroa doesn't bring the cocaine to this Lakeside Park incident, and what ensues after that at Lakeside Park, and then what ensued is the firebombing, was also part of the conspiracy in that it was clear that the defendant wanted to send a message. The message to be sent was that you do not back out of drug deals with the New Mexican Mafia. So in simpler terms, they refused to take no for an answer. So what Figueroa had in his mind about his abandonment is not relevant. What's relevant is what was going on inside of the conspiracy between the defendant and his co-conspirators within the Mexican Mafia. And as Polito testified, they still would have done a drug deal with Figueroa if Figueroa at some point would have brought them the drugs. But what's unclear is that the message, as it was sent, was sent to the wrong person. Of course, as you know from the facts, they hit the wrong house. So they really had no way of knowing that their message was sent. And the message was that they weren't going to take no for an answer. So in the minds of the co-conspirators, the defendant and the two co-conspirators who actually testified against them, they were still trying to procure cocaine. They were still trying to force Figueroa to deal with them in some capacity. So their agreement was still there and still in place at the time of the firebombing. Do you have any authority that deals with this argument that there has to be cocaine? I take it that your argument, your position is that the cases that say that in order to show the conspiracy, you have to show the agreement and it doesn't go and the objective, but it doesn't, the cases don't require any more than that. That is our authority. Just simply the cases that we cited that state what needed to be proven as far as the elements for an 846 drug conspiracy, along with Shabani about the requirements or the lack of requirement that the government has to show an overt act. So that's the authority we use here. And again, just looking at the evidence in a light most favorable to the government, there was not just talk. The existence of the firebombing, all the physical evidence that went along with that, the two recorded phone calls from one of the co-conspirators who testified where he admitted everyone's involvement long before he had a motive to lie for the crime, long before he was arrested for it. There were other pieces of evidence. There was more than just talk. And of course, the firebombing itself was an action in furtherance of the conspiracy and during the conspiracy. Does it require more than just talk? Does it require more than just talk? I thought you said earlier it doesn't require an overt act. No. Just talk can be enough as long as it shows the two elements and as long as the district court, or who's ever evaluating whether the case go to the jury, states that there's enough evidence for a rational juror to find that the talk rose to the level of the intent to commit the underlying offense. So if I walk out of the courtroom today and three gang members come up to me and point a gun at me, pull my wallet out and take my ID and say, we know where you live. Go get us five kilograms of cocaine and we'll come to your house and kill you. They have that agreement there. So, and that goes to the argument that there was no, no one had dominion and control over cocaine. And the example I just gave, the conspiracy to possess cocaine would definitely be inherent in those three without anyone having any type of ability, dominion or control to actually procure the drug. But the agreement would still be there. And the intent was still there. And that's what's required to show a conviction under 846. And moving on to the other count that was spoken about, the 924C count in the use of the destructive device in furtherance of. As we stated in our brief, you have the Smith case that says the destructive device, or in that case, a firearm, has to facilitate or have the potential of facilitating the drug trafficking crime. And that goes back to some of the arguments I made earlier about how exactly the destructive device facilitated or could have potentially facilitated a role in the offense. Again, the reason for the firebombs was to send a message that you do not back out of cocaine deals or drug deals with the New Mexican Mafia. And his testimony was elicited at trial. What at what point does the government lose the high ground here if the thing sort of morphs? Counsel says, look, okay, so they talked about cocaine. Nobody ever actually had any cocaine. And at some point, the whole thing turns into an extortion plea, which you could have charged separately, but the question is, is the throwing of a Molotov cocktail in connection with the drug deal? But at this point, it looks like they just want money. Is anybody still talking about drugs, or they just want the money? They wanted that money. But again, as Ryan Polito testified, that and he, what happens if there was a conversation at some point between Polito and Alcantara where Polito says, you know something, I don't think we're getting, I don't think this guy's got any cocaine. I think he's full of it. And Alcantara says, well, let's not give up on him yet. Maybe we can get some money out of him. And so nobody's interested in getting drugs. Nobody thinks they're getting drugs anymore. They just think that they're going to be able to get money out of him. Do you still have a charge there once they throw the Molotov cocktail? Yes, because in the facts we do have, and even under that scenario, the Smith case says that the destructive device has to be used to have the potential of facilitating the drug trafficking offense. So even in the scenario you just posed, if Figueroa goes back and says, okay, I got the message. You don't back out of drug deals. And he goes back and procures the cocaine and still tries to make a deal. Ryan Polito testified that they still would have made the cocaine deal with them, with Figueroa, if he would have provided the cocaine, if he would have came to the table with the deal. And again, what's most important here is what's going on in the agreement between the defendant and his co-conspirators, not what's going on or not the intent of Figueroa to actually deal with them. Again, they're trying to get Figueroa into this cocaine deal. They're trying to send the message that you don't back out of cocaine deals with the Mexican mafia. They're trying to send the message that if you're going to back out of the deal, there are going to be consequences. So, again, the drug deal itself is central, and that's why the throwing of the Molotov cocktails to try and send the message did have the potential of facilitating the actual drug trafficking offense and the drug trafficking conspiracy. Is there any significance to the suggestion that the purpose of the money was for the purpose of assisting the mafia in dealing with members that were incarcerated? Is that just a – is that part of this at all? It is part of it because that's a central tenet of the Mexican mafia, is that it's a prison gang. People become a member mostly when they're in prison. And so the people who are outside, one of their goals is to raise money to send to people to put on their books while they're in prison. And there was testimony about that from the two co-conspirators who were members of the Mexican mafia. And there were testimony that there is a hierarchy, there is a military-like structure, things have to be agreed upon. As a faction, they were sent down to Tucson to raise money for that exact purpose. So, again, that leads into the importance of sending a message, and that message having the potential of facilitating a drug dealing offense by saying, by trying to send the message that you do not back out of drug deals with the New Mexican mafia. That was the purpose of the firebombing, and that was elicited through testimony of Pulido and Moser, the co-conspirators who were also gang members. So how does this connect to the drug deal? Was the understanding that, listen, we're going to raise money by selling drugs and the money we receive from the drug sale is going to go assist those of us that are incarcerated? Is that all part of the whole thing, or is that just – That is part of the conspiracy, because it shows the association between the defendant and his co-conspirators, and it also shows their agreement. It solidifies their agreement, because it's not just three people who happen to have some association. There are three people that are part of a gang, part of a gang with a hierarchy structure. The defendant was a lieutenant. These two individuals who testified against him were sergeants. Pulido had to seek the approval of his lieutenant to even make the deal or try and set up the deal with Figueroa, because of the tenant of the New Mexican Mafia, particularly their people on the street, to make money to put on the books for the people that are incarcerated. So it's all part and parcel of the reason that sending the message of the firebombs could facilitate the drug trafficking offense, or in this case, the drug trafficking  I have another totally separate question. All right. What's your position on the allegation about the telephone records that were withheld? I was going to move that right there. Okay, good. So our position is that the telephone records themselves are not exculpatory, and there is no prejudice that associates with them, because the phone records themselves are not in any way exculpatory in terms of providing an alibi, in terms of showing someone else could have committed the crime. The records in question are for phone records of a co-conspirator, Ryan Pulido's phone, from roughly end of November 2007 to the middle of February in 2008. And then also records of a phone for him from months after the firebombing occurs in October of that year, and that was a time when the defendant was already in, he returned to custody, state custody. So the records that actually pertain to Pulido after the firebombing, the defendant was in custody for those. The records that pertain before the firebombing stop two and a half months before the firebombing began. The records stop about a month and a half or so before the defendant, before Pulido even has any dealings with Raul Figueroa or it's brought to the defendant at all that there was a cocaine deal possible. And as testimony was elicited from Pulido and Moser, the two co-conspirators who were part of the Mexican Mafia gang, they did not have a lot of contact with the defendant prior to the end of 2007. They didn't know each other. They were different individuals who were members of the Mexican Mafia who met down here because they were all out at the same time. So it's not like they had a preexisting relationship for years where the phone records would yield that they had calls back and forth. They started meeting toward the end of 2007, and as the testimony elicited, all these meetings were face-to-face. So that's where I think the defendant's brief falls short. They really do not show why they're exculpatory. The arguments are that they could be used for impeachment, but the records themselves can't be used to really impeach anything. The argument was just about general credibility. It wasn't about any specific thing that the phone records could have been used to impeach. There was no statement from Palito that, yes, I was calling the defendant a lot during this time frame from November of 2007 to February, to mid-February of 2012 or, I'm sorry, to mid-February of 2008. The testimony was that they met face-to-face and that the only testimony regarding calls between the defendant and the co-conspirators were for times when government agents did not get the records. They had no records for any phone that Palito had. In fact, the records show that once Palito stopped using the phone in mid-February of 2008, the number was reassigned to a female who had absolutely no connection with the case. The only calls made on the day of the firebombing, I believe, were to a pizza place and a water park. So the records themselves have no exculpatory value. They have no inculpatory value. They are completely innocuous. And that's what the court found. The court also, the district court also went into the fact that there was already extensive cross-examination into the credibility and the character of these two defendants. If the, if Your Honors went through the record, you actually saw photographs of the two co-conspirators who testified, many facial tattoos. Even the picture of Mosier really didn't do him any justice for how he looked at trial. He had much more facial tattoos. These two were in custody. They were brought out in front of the jury with handcuffs on in their jumpsuits. They were extensively cross-examined on their lengthy criminal histories, their bouts of mental illness and their well-documented mental illness histories. So in terms of using phone records to impeach their credibility, their credibility was already extremely in question for other things. And again, as we stated, the phone records themselves, no matter what context they can be used at, are innocuous. They have no value whatsoever, inculpatory and certainly not exculpatory. Thank you, Your Honors. Roberts. Counsel. Wilson. Mr. Court, Your Honors. Thomas Wilson. Judge, judges, to follow up on the phone record issue. The phone records had absolute value, exculpatory. It's not even a close call. The phone records were in the period at the end of 2007 through February 2008 when this first interaction happened with Pulido. And allegedly he was reporting directly to Mr. Alcantar. He had to get permission from Alcantar to do drug deals, to do business on behalf of the Mexican mafia, had to clear everything with him first. And what the phone records do show is that throughout that period, Alcantar approving everything through Pulido. Pulido calls Moser. He calls Koenig multiple times, 67 times in one day he makes calls. And the complete absence of any call ever to or from Alcantar. That's what the records show. The guy you report to every day, he never calls you and you never call him. And certainly that would have been relevant at trial. Additionally. The firebombing incident is in, is it April or May? Yes, after the phone record period. It's May. So it's a couple of months later. The incidents with Figueroa, the incidents at the park and the attempted extortion occur when? April? Yes, after the phone records. Okay. So how would the phone records go to the question as to whether they did the things of which they're accused in April and May, which seem to me to be the critical events? Pulido is doing the things. And the only tie Mr. Alcantar has to the conspiracy is allegedly he's approving it. He's the mastermind. He's the big boss. Right. But he could be approving it in April and May and that would be sufficient to convict him under the government's theory. Well, Pulido's testimony is that he's working for Alcantar throughout this time. Okay. Let's pick up on what the assistant U.S. attorney said. Did Mr. Pulido ever say, I spoke with Alcantar by phone between December of 2007 and February of 2008? I don't specifically recall that testimony for those dates. He said he spoke with him on the phone all the time and he had to get approval for everything. But I don't think he specified what date all the time was. But the relationship began towards the end of the last three months of 2007 and continued into 2008, exactly when the records were. And the purpose of the records is the records, of course, won't disclose anything of the content of any discussion. What you're looking for principally is the absence of a phone call to or from Alcantar. Which is what they do show, yes, Judge. We have the records now. Didn't have them at trial, didn't have them until a month after trial. Additionally, the State followed up with its investigator of Volkhov at trial and asked him, and he said, no, the records don't show anything. What about the absence of any calls to or from Alcantar? And the government's agent said, no, we couldn't tell. We didn't know. That's a false statement. The defense could have obviously cross-examined them if they had the records. They ran down every number. They had names, birthdates. They knew that Alcantar was not there. At this point, of course, the district court has ruled on this, and we're trying to figure out how serious. I mean, it looks like the records should have been turned over and you might have done something with them. I'm just trying to figure out how much you really can do with this. Well, the government agent lied about the phone calls three times and had that Well, forget the lying. The lying is really of no consequence at this point. The question is, what would the – if we introduced these records, what would that have done for your case? Could have impeached the detectives, and the government's case of conspiracy is undermined when the conspirators all talk on the phone with the absence of one person, my client. During that period, do we have phone records after the February period? No. Okay. So any evidence that we had of conversations between Alcantar and Polito after February of 2008 had to be demonstrated by somebody either observing them or overhearing them or somebody saying, we spoke? Yes. Okay. Do we have any evidence of that? No. We don't have any evidence that Alcantar and Polito spoke? Just Polito saying so. Okay. Well, that would be evidence, wouldn't it? Okay. Should we believe him or not believe him? Well, I think that Given that the jury believed him, aren't we obligated to accept that here? I think if we had the phone records to show, and the jury had been able to see, that during the first three months that you worked for him, you never called him. So we're to believe that as soon as the government no longer has phone records, that's when all these phone calls started. So the incident where Polito has Figueroa in the car and Alcantar is someplace else, is Polito talking to Alcantar on the phone during that period, during that incident? Polito says so. But just Polito says so. We don't have the phone records for that? No. Okay. The indictment comes after it's too late for anybody to get any records. Right. But if the jury were to believe Polito saying, I'm talking to Alcantar while we've got Figueroa trying to figure out what to do with this guy, that would be sufficient to show conspiracy, whether or not they'd ever spoken in December to February, wouldn't it? Well, conspiracy to do what, I guess? The issue is Right. I understand the problem about the cocaine, but there's certainly conspiracy to do something here, whether it's to extort money or whether it's to deal cocaine or do something else. But it's certainly evidence of some kind of potential agreement or conversation between the two. A conversation between the two, yes, in potentially furtherance of an extortion, certainly could be. The one issue I wanted to address, Your Honor, the you don't back out of a drug deal with the Mexican mafia, that's the message. That's completely absent from the record. In fact, the record contradicts that. It's exactly the opposite. What they had was never a drug deal. It was nobody brought drugs and nobody brought money. So neither side brought anything. The brag, I can get you kilos of cocaine, was what the State represented that Figueroa said that was part of the deal. He said, I can get you kilos of cocaine. You need cocaine? I got cocaine. You let me know. That was it. That was just somebody bragging that they got drugs. There was no deal. Okay. How much? I got 2,000. How much will that buy me? We'll meet at the park. None of that happened. It was just I'm the cocaine guy. If you need it, you just come see me. Okay. Good to know. Thanks. And then no drugs, no money. Then the kidnapping. Then 25,000. No, 6,000. $6,000 and you die. Okay. 6,000 and I die. He pays 200. The phone call between Moser and the government's informant, Juan Rios, was Polito talked to and Polito talked to them, said he hadn't received any more money from Figueroa. So they said, okay, we need to send a message. Not a message because he backed out of some drug deal. A message, you owe me $6,000. And there was no or bring me drugs, give me 6,000, or your mother's car, or a truckload of cigarettes. It was $6,000 or else. There was no alternative. Bring me some drugs. We can do that drug deal thing still if you want. None of that. Okay. Thank you. Thank both counsel for the argument. The case is submitted. And our final case on the oral argument calendar is Plata v.
judges: Beistline, Schroeder, Bybee